UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| HAZEL S., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4: 22 CV 172 JMB |
| ) | |
| KILOLO KIJAKAZI, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Hazel M. Smith for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act (Act), 42 U.S.C. §§ 401-434, 1381-1385.  The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons set forth below, the final decision of the Commissioner is reversed and remanded.

## **I.  BACKGROUND**

Plaintiff was born in 1976.  She alleged an October 7, 2019 disability onset date when she was 43 years old.  She filed her applications on October 7, 2019, alleging disability due to lupus, rheumatoid arthritis, and osteoarthritis.   (Tr. 170-78.)  Her applications were denied initially and on reconsideration, and she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 102-06, 110.)

On November 24, 2020, following a hearing, an ALJ issued a decision finding that plaintiff was not disabled under the Act. (Tr. 11-20.)  The Appeals Council denied review.  (Tr. 1-5.)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  ADMINISTRATIVE RECORD

The Court adopts the parties' facts as set forth in their supporting briefs.  (Docs. 21-22.)  These facts, taken together, present a fair and accurate summary of the medical record and testimony at the evidentiary hearing.  The Court will discuss specific facts in detail where relevant to this appeal.

## III.  DECISION OF THE ALJ

On November 24, 2020, following a hearing, an ALJ found that Plaintiff was not disabled.  At step one of the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 7, 2019, her alleged onset date.  At step two, the ALJ found that Plaintiff had severe impairments that included degenerative joint disease, rheumatoid arthritis, Raynaud's disease, sacroiliac joint dysfunction and bursitis of the left hip, osteoarthritis of the feet, and obesity.  (Tr. 13.)  The ALJ found that Plaintiff did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. part 404, subpart P, appendix 1.  (Tr. 14.)  The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform "sedentary" work as defined under the regulations.  She was also limited to "frequent operation of hand controls bilaterally; frequent handling and fingering bilaterally; occasional climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; and no concentrated exposure to extreme cold or extreme heat."  (Tr. 15.)  At step four, the ALJ found Plaintiff was unable to perform her past relevant work (PRW).  Relying on vocational expert testimony, the ALJ found that Plaintiff's impairments would not preclude her from performing work that exists in significant numbers in the national economy, including work as a document specialist, addresser, and nut sorter.  (Tr. 19-20.)  Consequently, the ALJ found that Plaintiff was not disabled under the Act.  (Tr. 20.)

## IV.  STANDARD OF REVIEW

The Court's role on judicial review of the Commissioner's final decision is to determine whether the Commissioner's findings applied the relevant legal standards to facts that are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.*  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. *Id.*  As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires*, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing five-step process).

Steps one through three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her condition meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  Step four requires the Commissioner to consider whether the claimant retains the RFC to perform PRW.  Id.; § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating she is no longer able to return to her PRW. *Pate-Fires*, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return

to her PRW, the burden shifts to the Commissioner at step five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

Plaintiff argues the ALJ erred in failing to properly evaluate the medical opinions of treating rheumatologist Joshy Pathiparampil, M.D., and medical consultants Richard Tipton, M.D., and Kevin Threlkeld, M.D.  She also argues the ALJ erred in evaluating her credibility.  This court agrees.

### 1.  Medical Opinion Evidence

Plaintiff applied for benefits after March 27, 2017, and therefore the ALJ applied the new set of regulations for evaluating medical evidence.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15,132 (Mar. 27, 2017)).  The revised regulations redefine how evidence is categorized, including "medical opinion" and "other medical evidence," and how an ALJ will consider these categories of evidence in making the RFC determination.  *See* 20 C.F.R. §§ 404.1513(a), 404.1520c.

The new rules provide that adjudicators evaluate all medical opinions and findings using the factors delineated in the new regulations.  Supportability and consistency are the most important factors, and their application must be explained.  Supportability means the extent that a medical opinion is supported by the relevant objective medical evidence and the explanations provided by the medical source.  POMS DI 24503.025.  Consistency means the extent a medical opinion is consistent with the evidence from other medical and nonmedical sources.  *Id.* Other factors which "will be considered" and about which adjudicators "may but are not required to explain" are the medical source's "treatment relationship" with the claimant, including the length, frequency, purpose and extent of the treating relationship, and whether the source has an examining (as opposed to non-examining) relationship with the claimant; specialization; and "other factors" such as

whether the source has familiarity with other evidence in the claim or understanding of the Administration's disability program's policies and evidentiary requirements. *See* 20 C.F.R. § 404.1520c(b), (c) (2017).

Under the new regulations, a "medical opinion" is a statement from a medical source about what an individual can still do despite her impairments and includes limitations or restrictions about the ability to perform physical, mental, sensory, and/or environmental demands of work. 20 C.F.R. § 404.1513(a)(2). A medical opinion does not include judgments about the nature and severity of an individual's impairments, medical history, clinical findings, diagnosis, response to prescribed treatment, or prognosis. 20 C.F.R. § 404.1513(a)(3).

### Joshy Thomas Pathiparampil, M.D.

On October 7, 2019, Plaintiff saw Umar Daud, M.D., her then rheumatologist, for follow up. (Tr. 276-83.) Plaintiff reported continued pain and swelling of the small joints of her hands with redness and warmth in the morning and stiffness lasting one hour. (Tr. 276.) Dr. Daud observed mild swelling and tenderness in her second, third and fourth metacarpophalangeal (MCP), or knuckle joints, in both hands and mild tenderness of the lower lumbar spine. (Tr. 278.) Dr. Daud diagnosed positive ANA (antinuclear antibody) and inflammatory polyarthritis. He prescribed hydroxychloroquine, used to treat autoimmune diseases, among other things; methotrexate, a disease-modifying antirheumatic drug (DMARD) that works by decreasing the activity of the immune system; and folic acid. (Tr. 281.) Dr. Daud prescribed methotrexate because hydroxychloroquine had helped slightly, but not completely. Plaintiff was instructed to continue to follow up with her pain management provider for her non-inflammatory low back pain and to quit smoking. Dr. Daud referred her to another rheumatologist, Joshy Thomas Pathiparampil, M.D.

Plaintiff saw Dr. Pathiparampil on February 24, 2020. She reported continued joint pain in her hands, shoulders, and feet with morning stiffness lasting 15-20 minutes, mainly

in her legs and feet. She had been seen in the emergency room a week earlier for back pain and was prescribed prednisone, a steroid, and cyclobenzaprine, a muscle relaxant, which provided partial relief. (Tr. 484.) On examination, Dr. Pathiparampil observed tenderness in her left, third MCP joint. She was able to make a fist with decreased grip strength and had tenderness to her proximal left lower leg and tenderness to her lumbar spine. (Tr. 489.) Blood tests showed positive anti-cyclic citrullinated peptide antibody positive (CCP antibody test), used to detect rheumatoid arthritis; and anti-RNP antibodies present, found often in very high levels in patients with a variety of systemic rheumatic diseases. Dr. Pathiparampil diagnosed rheumatoid arthritis of multiple sites, tobacco use disorder, chronic midline low back pain, and peptic ulcer disease. Since Plaintiff's symptoms were not controlled, Dr. Pathiparampil increased her dose of methotrexate. He also diagnosed Raynaud's disease, a condition that causes the blood vessels in the extremities to narrow, restricting blood flow, with positive antibodies to ribonucleoprotein (RNP), consistent with connective tissue disease, and continued conservative hand-warming techniques. He believed she probably also had fibromyalgia but was not sure of this diagnosis. (Tr. 490.)

On April 23, 2020, Dr. Pathiparampil noted that Plaintiff reported morning stiffness in her lower legs and feet lasting 30 minutes, and joint pain in her hands, shoulders, and feet, mainly present with activity. She was being seen by a pain management provider for chronic back pain. She was unable to obtain the epidural steroid injections for back pain due to lack of insurance and could not tolerate NSAID's due to peptic ulcer disease. On physical examination, Dr. Pathiparampil observed tenderness to her MCPs bilaterally, left greater than right, and she was able to make a fist with decreased grip strength. Dr. Pathiparampil increased her dose of methotrexate because her symptoms were not controlled. (Tr. 644-50.)

Plaintiff saw Dr. Pathiparampil on August 6, 2020. She reported experiencing nausea while taking methotrexate over the past three weeks, even when taken in a divided dose, and even though she had not previously experienced side effects from methotrexate.

She had morning stiffness in her lower legs and feet lasting for 30 minutes. She had worsening pain in her upper shoulders with activity. She had significant low back pain with activity, which was also present in the morning. On physical examination, Dr. Pathiparampil observed she was able to make a fist. She had tenderness to her trapezius muscles, midline lumbar spine, and paralumbar muscles. Dr. Pathiparampil decreased her methotrexate in light of her nausea and discontinued her hydroxychloroquine. He prescribed cyclobenzaprine to treat symptoms from fibromyalgia syndrome (FMS) and musculoskeletal pain. Dr. Pathiparampil noted that Plaintiff's osteoarthritis was mostly symptomatic in her spine, knees, and feet. (Tr. 681-87.)

On September 14, 2020, Dr. Pathiparampil completed a medical assessment. He listed Plaintiff's diagnoses of rheumatoid arthritis; Raynaud's disease; and fibromyalgia. Dr. Pathiparampil confirmed that objective tests and clinical findings supported his opinion, namely, blood tests that showed positive CCP antibodies and positive RNP antibodies. He opined that Plaintiff's subjective complaints were reasonably consistent with the diagnoses and clinical findings. (Tr. 619.)

As to functional capacity, Dr. Pathiparampil opined that Plaintiff could lift and carry 0-10 pounds; stand and walk no more than 2 hours in an 8-hour workday; and sit at least 6 hours in an 8-hour workday. She could not use the upper extremities for gross manipulation, handling, fingering, and feeling "frequently," described as 2/3 of the day. She would be expected to be off-task more than 16% of the time secondary to pain and would require an extra 1.5-hour break during an 8-hour workday. (Tr. 620.) When asked if Plaintiff could perform sedentary work, Dr. Pathiparampil stated, "Yes, I think she would be able to perform sedentary work; however, I am not sure if her continued symptoms are stable enough at this time. Treatment of RA should allow for this eventually." (Tr. 619.)

The ALJ did not find Dr. Pathiparampil's opinion persuasive. The ALJ stated:

> Although the claimant has sedentary limits, the record does not support the occasional fingering and handling limits. The upper extremity exams during the period at issue were unremarkable and her hand x-ray was unremarkable.

> One positive finding regarding the right hand does not show a permanent limitation, especially since the same doctor found relatively normal findings for the hand a few months later. Moreover, as noted above, the treatment notes show a normal gait and normal motor strength of the upper and lower extremities.  The record as a whole does not support her being off task, especially since she is able to perform a wide variety of daily activities.

(Tr. 18.) (record citations omitted.)

Plaintiff argues the ALJ failed to explain how she considered the supportability factor with respect to Dr. Pathiparampil's opinion.  She also argues the ALJ erred on several other counts and therefore substantial evidence does not support her decision.

Plaintiff first notes that the x-ray referred to by the ALJ is dated June 10, 2019, predating her alleged onset date by four months.  A review of the record shows Plaintiff's hand x-ray is dated May 26, 2020, within the relevant time period, and was taken when she was seen in urgent care after falling on her right wrist while walking her dog.  (Tr. 655-57.)  Plaintiff is correct, however, in noting that the ALJ provided no authority for the proposition that x-rays are used to detect soft tissue swelling or pain in the hands in assessing rheumatoid arthritis.

Plaintiff next argues the ALJ mischaracterized her upper extremity examinations as "unremarkable."  The court agrees.  Specifically, on October 7 and November 7, 2019, Dr. Daud observed mild swelling and tenderness in Plaintiff's bilateral second, third and fourth MCP joints and mild tenderness of the lower lumbar spine.  (Tr. 278, 404.)   On February 24, 2020, physical examination under Dr. Pathiparampil revealed tenderness to the left, third MCP joint, and Plaintiff was able to make a fist with decreased grip strength.  (Tr. 627.)   On April 23, 2020, physical examination revealed tenderness to her MCPs bilaterally, left greater than right, and she was able to make a fist with decreased grip strength. (Tr. 649.)   Dr. Pathiparampil increased her methotrexate because Plaintiff's symptoms were not controlled, and she also was showing signs of fibromyalgia. (Tr. 650.) On August 6, 2020, Plaintiff had worsening pain in her upper extremities with activity and her elbow, wrist, and hand examination was unremarkable.  (Tr. 686.)  Plaintiff had been

taking an increased dose of methotrexate up until that time, but that Dr. Pathiparampil subsequently had to decrease her dose because of side effects. (Tr. 687.) Finally, Dr. Pathiparampil diagnosed Reynaud's disease, which affects the extremities. (Tr. 619-20.)

The ALJ also stated in her decision that the same doctor who purportedly observed "unremarkable" findings during physical examinations on February 24, April 23, and August 6, 2020, also found non-permanent limitations of the right hand. (Tr. 627, 649, 657, 686.) However, the record evidence shows it was not the same doctor. Dr. Pathiparampil was Plaintiff's treating rheumatologist from February through August 2020. Timothy Cook, family nurse practitioner, was the provider who found the non-permanent limitations in the emergency room following Plaintiff's trip-and-fall on May 26, 2020. (Tr. 657.) Plaintiff also notes the ALJ improperly considered motor strength when evaluating her hand pain and swelling because motor testing is used to evaluate deficits from neurologic disorders, not joint pain and swelling from rheumatoid arthritis as she alleges.

Defendant Commissioner counters that substantial evidence supports the ALJ's assessment of Dr. Pathiparampil's opinion. Defendant contends the ALJ properly evaluated both the supportability and consistency of Dr. Pathiparampil's opinion as required under the regulations. As to Plaintiff's argument that the ALJ mischaracterized her upper extremity examinations as unremarkable, Defendant concedes that read in isolation, Plaintiff "perhaps has a point." (Br. 8.) Defendant contends however that throughout the decision the ALJ acknowledged that Plaintiff had positive findings including decreased grip strength, and swelling and tenderness of the second, third, and fourth MCP joints, and the ALJ was simply reciting statements from Plaintiff's own physicians that her elbow, wrist, and hand exams were "unremarkable." (Tr. 17-18, 550, 649, 686.) Defendant argues it is proper for the Court to look to the ALJ's entire decision rather than focusing on the medical opinion analysis in isolation, citing *Trosper v. Saul*, No. 1:20 CV 51 DDN, 2021 WL 1857124, at *6 (E.D. Mo. May 10, 2021) ("When the decision is read in its entirety, instead of only the single paragraph addressing Ms. Pullum-

Thompson's opinion read in isolation, it shows the ALJ properly considered the record evidence as whole when evaluating the supportability and consistency of the opinion.  In sum, Ms. Pullum-Thompson's opinion is not supported by objective evidence or consistent with the remainder of the record.").  In short, Defendant asserts the overarching fact is that the ALJ considered the medical findings which were generally mild or normal, and that such limitations did not support additional limitations in the RFC.

After reading the decision in its entirety, as well as the paragraph addressing Dr. Pathiparampil's opinion, it is not clear how the ALJ considered supportability and consistency.  The record evidence shows Dr. Pathiparampil's opinion is supported by objective blood testing and clinical findings with positive ANA, as detailed above.  Second, the record shows Plaintiff's methotrexate dosage, used to treat her RA, was progressively increased during the course of her treatment because her RA was not yet stabilized or controlled.  As Plaintiff points out, the ALJ's reliance on Plaintiff's hand x-ray is not relevant to her autoimmune diagnoses which are generally diagnosed with bloodwork and urinalysis.[1]  The record evidence also shows Plaintiff's upper extremity exams were not "unremarkable."  Plaintiff had pain and swelling in the small joints of her hands and mild swelling and tenderness of her bilateral MCP joints on October 7, 2019.  She had tenderness in her left MCP joint on November 4, 2019, and joint pain in her hands and shoulders on April 23, 2020.  She was diagnosed with Raynaud's disease, which affects the extremities, including hands.  On August 6, 2020, she had worsening pain in her upper shoulders with activity.

Plaintiff also asserts the ALJ should not have considered her motor strength when evaluating swelling and pain in her hands. Defendant asserts motor strength is relevant in

---

[1]  Tests that may be done to diagnose an autoimmune disorder include: Antinuclear antibody (ANA) tests, Autoantibody tests, Complete blood count (CBC) with white blood cell differential (CBC with WBC differential), Comprehensive metabolic panel, C-reactive protein (CRP), Erythrocyte sedimentation rate (ESR), and Urinalysis. https://www.mountsinai.org/health-library/diseases-conditions/autoimmune-disorders. (last visited June 23, 2023).

formulating Plaintiff's RFC.  The court agrees motor findings may be relevant to assessing a claimant's ability to perform the exertional demands of work and therefore concludes the ALJ committed no error.  *Cf.*, *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019) (discrediting plaintiff's complaints of severe disabling pain; noting physical examinations indicated normal motor strength in upper and lower extremities; full extension, a normal range of motion, and good stability in knees; and pain rated at 3-4).  The ALJ's decision notes that physical exam results show a normal gait and normal motor strength of the upper and lower extremities.  While this may be true, the symptoms outlined by the ALJ are not normal findings suggestive of autoimmune disorders.  The record evidence consistently documents positive bloodwork and other objective testing, the diagnostics used for autoimmune disorders.

Finally, Plaintiff takes issue with the ALJ's conclusion that "she is able to perform a wide array of daily activities." (Tr. 18.)  In support, Plaintiff notes that she repeatedly reported that she needs to take breaks when performing activities of daily living, consistent with Dr. Pathiparampil's opinion that she would be off task more than 16% of the day.  For example, Plaintiff testified to the following at her hearing.  Walking and moving around increases her pain.  Her grown daughter helps her prepare meals.  If her daughter is not available, then she eats a sandwich. She can dress and bathe herself although it takes her a while to take a shower because of pain in her shoulders and a heavy feeling in her arms.  It takes her "a while" to mop, sweep, and vacuum, and about a half-hour to wash dishes because she needs to sit down and rest.  She does not go grocery shopping alone and shops with her daughter.  She cannot carry groceries. Pain in her hands interferes with her activities of daily living and she consequently drops things.  She can do her own laundry, watch television, and go on Facebook three times per week for ten minutes at a time.  She does not garden, take out the trash, travel, attend church, belong to any social organizations, or volunteer.  (Tr. 42-48.)  In her October 2019 Function Report, Plaintiff reported that her

former hobbies included walking, knitting, fishing, and camping but she was no longer able to engage in these activities because of her condition. (Tr. 217, 220.)

In light of the above, the court concludes the ALJ mischaracterized Plaintiff's activities of daily living. Accordingly, the court concludes substantial evidence does not support the ALJ's conclusion that she is able to perform a wide variety of daily tasks.

This court cannot say the ALJ properly evaluated the opinion evidence of Dr. Pathiparampil. Since the ALJ failed to properly evaluate opinion evidence, which led to an unsupportable RFC assessment, the hearing decision is not supported by substantial evidence. This case is remanded for reconsideration of Dr. Pathiparampil's opinion using the factors set forth in 20 C.F.R. § 404.1520 for analyzing medical opinion evidence. The ALJ shall then reevaluate plaintiff's RFC, and, if necessary, consult with a vocational expert regarding all of the limitations supported by the evidence.

**State agency medical consultants Richard Tipton and Kevin Threlkeld**

Plaintiff also argues the ALJ erred in evaluating the prior administrative medical findings of state agency consultants Richard Tipton, M.D. and Kevin Threlkeld, M.D. Dr. Tipton opined that Plaintiff could perform light work. He found no manipulative limitations. (Tr. 61-62.) Dr. Threlkeld found that Plaintiff was limited in her bilateral upper extremities. He believed her hand controls, and handling and fingering, were limited to frequently. (Tr. 83-88.)

The ALJ found the opinions "generally persuasive." (Tr. 18.) The ALJ stated:

> The State agency medical consultants noted that the claimant had a reduced light residual functional capacity with frequent postural and manipulative limitations, and limits to exposure to heat, cold, and fumes. The opinions are generally persuasive, although the undersigned found that the claimant had additional limits due to later complaints of foot pain that restricted her to sedentary work.

(Tr. 18.)

Plaintiff argues the ALJ failed to explain how the opinions from the medical consultants are consistent with and supported by the evidence as required under the regulations. She argues that Dr. Pathiparampil, a specialist in rheumatology, is in a better position to determine Plaintiff's ability to handle and finger objects than the ALJ and the non-treating, non-examining general practitioners. She argues the medical consultants did not have the opportunity to review Dr. Pathiparampil's medical opinion because if they had done so, they should have found that Plaintiff cannot handle and finger frequently when she experiences pain, swelling and stiffness, especially with activity. She contends the ALJ's failure to properly evaluate medical opinion evidence is legal error because it should have changed the outcome of the case.

Defendant asserts that the discussion of the other record evidence supporting greater limitations amounts to consideration of the consistency factor, regardless of whether the ALJ actually used the term consistency, citing *Diane M. W. v. Kijakazi*, No. 20-CV-2651 (SRN/ECW), 2022 WL 4377731, at *5 (D. Minn. Sept. 22, 2022)("The ALJ need not use the magic words of 'supportability' and 'consistency,' but it must be clear they were addressed.")

Under the revised regulations, courts have held that ALJs can find prior administrative findings (PAMFs), such as Drs. Tipton and Threlkeld, more persuasive than other opinions. *See McCoy v. Saul*, No. 4:19-CV-00704-NKL, 2020 WL 3412234, at *9 (W.D. Mo. June 22, 2020) (ALJ properly considered PAMFs and found them more persuasive than the other opinions as the regulation allows); *see also Morton v. Saul*, No. 2:19-CV-92 RLW, 2021 WL 307552, at *8 (E.D. Mo. Jan. 29, 2021) (While plaintiff asserts the ALJ improperly relied on agency consultant's opinion, the new regulations require the ALJ to consider the opinions of state agency medical consultants because they are highly qualified and experts in Social Security disability evaluation."). *See* 20 C.F.R. § 404.1513a.

Reading the ALJ's paragraph concerning Drs. Tipton and Threlkeld, alone or in conjunction with the decision as a whole, it is not clear whether supportability and consistency, let alone other factors such as specialization, were considered in making her decision. The ALJ must therefore reevaluate the medical opinions with additional discussion explaining how the evidence supports the conclusion, specifically addressing consistency and supportability.

Plaintiff's argument that the consultants did not have access to all of the record evidence is without merit, however. Assuming this were true, this alone does not undermine the ALJ's reliance on their findings, as the ALJ considered the entire administrative record, including any evidence that the consultants were not able to review.

**2. Subjective Complaints of Pain**

Plaintiff finally argues the ALJ's credibility assessment is not supported by substantial evidence. She contends that while the ALJ clearly credited some of her allegations when limiting her to a reduced range of sedentary work, the ALJ ignored other allegations which would preclude her from even sedentary work. Plaintiff cites the same evidence discussed earlier, such as the need to take breaks when performing activities of daily living, and the court will not restate them here.

Defendant counters that the ALJ offered multiple reasons for finding Plaintiff's subjective complaints were not entirely consistent with the record as a whole, including mild or normal objective findings when weighing Plaintiff's complaints and the fact that she was not taking pain medication.

Part of the RFC determination includes an assessment of the claimant's credibility regarding subjective complaints. Using the Polaski factors, "[s]ubjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (noting Polaski factors must be considered before discounting subjective complaints). In addition to the claimant's prior work record, the Polaski factors include (1)

the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Polaski*, 739 F.2d at 1322 ; see also 20 C.F.R. § 404.1529.  An ALJ may also rely on objective evidence as a "useful indicator" in evaluating subjective complaints. *See* 20 C.F.R. § 416.929(c)(2).

Here, the ALJ failed to consider the Polaski factors.  The adjudicator is "not required to discuss each Polaski factor as long as '[she] acknowledges and considers the factors before discounting a claimant's subjective complaints.'"  *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)). The ALJ did not do so here.  The ALJ failed to delineate these factors in her credibility determination even though, as discussed above, the objective evidence and clinical findings support Plaintiff's allegations of pain and limitation.  *See* 20 C.F.R. § 416.929(c)(2) (ALJ may rely on objective evidence as a "useful indicator" in evaluating subjective complaints.) As a result, Plaintiff's actual activities of daily living do not support the ALJ's findings.

The ALJ here failed to make an express credibility determination detailing good reasons to discredit Plaintiff's testimony that she has difficulty with activities of daily living.  *See Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018) (quoting *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (district court will defer to the ALJ's determinations "as long as good reasons and substantial evidence support the ALJ's evaluation of credibility."). Because the ALJ failed to properly evaluate credibility, the administrative decision is not supported by substantial evidence.  This case is reversed and remanded for further consideration of how pain from rheumatoid arthritis, Raynaud's disease, and fibromyalgia, affect Plaintiff's functioning.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded. An appropriate Judgment is issued herewith.

Upon remand, the Commissioner shall reevaluate the medical opinions of Joshy Pathiparampil, M.D., Richard Tipton, M.D., and Kevin Threlkeld, M.D., and provide principled reasons in evaluating their persuasiveness, specifically addressing consistency and supportability. The ALJ must also reassess plaintiff's subjective complaints of pain from rheumatoid arthritis, Raynaud's disease, and fibromyalgia, and explain how she incorporated these limitations into the RFC or provide reasons for discounting the limitations.

          */s/ John M. Bodenhausen*
          **UNITED STATES MAGISTRATE JUDGE**

Signed on the 29th day of June, 2023.